69 So.2d 120 (1953)
NORMAN
v.
STATE et al.
No. 8085.
Court of Appeal of Louisiana, Second Circuit.
December 2, 1953.
Rehearing Denied December 29, 1953.
Writ of Certiorari Granted February 15, 1954.
*122 H. S. Hawthorne, Bastrop, W. Crosby Pegues, Jr., D. Ross Banister, Philip K. Jones, Louis S. Quinn, Joseph A. Loret, Baton Rouge, for appellant.
Browne, Browne & Bodenheimer, Shreveport, for appellee.
Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, intervenor.
HARDY, Judge.
This is a suit by plaintiff against the State of Louisiana, under the authority granted by Act No. 102 of 1952, for the recovery of damages in the nature of personal injuries allegedly resulting from the negligence of the Department of Highways, an agency of the State of Louisiana. An intervention was filed by Indemnity Insurance Company of America, the carrier of compensation insurance for plaintiff's employee, claiming a total of $5,767.80 which it had paid as compensation and medical expenses out of any judgment which might be rendered in favor of plaintiff. The case was twice tried before a jury. On the first occasion a mistrial was entered by reason of the inability of the jury to agree on a verdict. After the second trial the jury returned a verdict in favor of plaintiff and against the defendant, fixing damages in the total sum of $41,767.20, and, after overruling defendant's motions for a new trial and a rehearing, judgment in accordance therewith was signed by the district judge. From this judgment defendant has appealed and plaintiff has answered the appeal praying for the amendment of the judgment by an increase to the extent of an additional sum of $26,000.
The jury was polled after the second trial and it was determined that the verdict had been agreed upon by a nine to three vote of the members of the jury.
A motion for new trial was filed by counsel for defendant. In briefs before this court counsel for defendant made a number of statements bearing upon the actions of the district judge with respect to disposition of the motion for a new trial. It is obviously intended that the effect of these declarations and the consequent arguments thereon should be considered by this court as having some persuasive influence in its consideration of this appeal. This effect cannot be accorded inasmuch as these particular statements in brief are completely de hors the record and are entirely unsupported by the minutes of the court. For this reason the arguments advanced in this connection must be entirely disregarded. An appellate tribunal with reference to such contentions must rely upon the minutes of the court, and defendant's procedure for relief should have been by way of the correction of the minutes or a statement from the trial judge incorporated in the record. With further relation to this point, reference to the minutes discloses the fact that the case was submitted to the jury on May 6, 1953, which returned *123 its verdict at 2:18 a. m. on May 7th; that the court then rendered judgment in favor of plaintiff pursuant to said verdict and discharged the jury. Following this action the minute entry reads:
"* * * whereupon the defendant filed a motion for a new trial and same was then set for trial at 10:00 o'clock A. M. this date (May 7, 1953) (Judge Heard.)"
According to the minute entry of May 7, 1953:
"Motion for a new trial taken up, argued, to be submitted on briefs. Brief of Mover to be submitted on or before May 18, 1953, brief of defendant in motion to be filed on or before May 25, 1953."
The minute entry of June 2, 1953, reads:
"Motion for new trial overruled. Written reasons filed. (Judge Heard)."
Referring to the written reasons assigned by the district judge overruling the motion for a new trial, we find that after briefly reciting the facts leading up to the verdict of the judge the court said:
"The defendant has filed a motion for a new trial, which is the issue now before the Court.
"In its verdict, the jury itemized its findings and one of the items was the amount asked for by the compensation insurance carrier, The Indemnity Insurance Company of North America, but instead of awarding this amount out of the judgment rendered in favor of the plaintiff, the jury added this amount to the amount of damages, which is contrary to L.R.S. of 1950, 23:1103, and for this reason a new trial probably should be granted, but inasmuch as this case has been tried twice at considerable expense, and the Court of Appeals having authority to correct this error, it is the opinion of the Court that the motion for a new trial should be overruled."
We find nothing in the voluminous record, of more than 900 pages, which would justify our consideration of the observations, assertions and arguments of distinguished counsel for defendant on this particular point. We have felt it desirable to devote this attention to the matters set forth in order that counsel may thoroughly understand our reasons for an enforced refusal to consider the contentions urged as having any weight or effect upon our determination of this appeal.
Proceeding to a consideration of the merits of the case we observe that only questions of fact are concerned. Plaintiff alleged that he suffered serious and painful injuries which resulted in a complete and permanent disability to perform manual labor as the result of accidental injuries directly attributable to the negligence of defendant's agency, the Department of Highways.
Plaintiff, a man of 44 years of age at the time of the accident, was employed by Dowell, Inc., as a truck driver. Early on the morning of September 21, 1948 plaintiff was driving a heavy duty truck and trailer loaded with tanks of hydrochloric acid for use in oil well operations, the total weight of the truck and its burden being estimated at approximately twenty-nine tons. Plaintiff's truck was the middle vehicle in a convoy of three, all of which were of approximately the same gross weight except that it appears that the lead truck, which was followed by plaintiff's vehicle, exceeded the weight of plaintiff's truck and load. Shortly after 8:00 o'clock a. m. the three trucks, which had been proceeding in a westerly direction on paved highway No. 165, came into the gravel State Highway No. C-1488 and halted at a point on said highway in Morehouse Parish at or near a bridge over Bayou Bartholemew, which structure appears to have been known in the locality as the Point Pleasant Bridge. The purpose of this stop was to await the arrival of Mr. C. A. Prince, service engineer employed by Dowell, Inc., who was to lead the truck convoy to its destination, the site of oil well operations.
At about 8:00 o'clock on the date noted Prince made connection with the convoy, *124 and, in his automobile followed by a Jeep, led the way across the Point Pleasant Bridge. The crossing was successfully and safely negotiated by Prince's automobile, the Jeep and the lead truck. Plaintiff waited for the passage of a school bus which crossed the bridge in the same direction, and then proceeded to drive his truck upon the bridge, entering the east end of the said structure. When plaintiff had negotiated what he estimated to be about two-thirds of the distance from the entrance of the bridge to the middle span, which was of steel construction, the floor of the bridge collapsed under the trailer of the unit which, in its fall, pulled the truck with it to the bottom of a ravine some twenty feet beneath the bridge. Plaintiff was caught and pinned in the cab of the truck where he remained for approximately an hour, more or less, until he was cut loose from the entangling entrapment, placed upon a stretcher and removed by ambulance to a hospital in nearby Bastrop. Plaintiff sustained injuries of a most serious and painful nature which were set forth in his petition and a supplemental petition later filed and allowed by the court, which injuries will be discussed in some detail later in the course of this opinion.
Plaintiff's general charge of negligence against defendant is based upon the proposition that the Point Pleasant Bridge was in a defective, rotten condition to the actual or implied knowledge of defendant, its agents and employees; that the defendant was under the duty and obligation to maintain the bridge in such condition as would assure the safe passage of vehicular traffic traveling thereover, and its failure so to do was the negligence which caused the accident.
In answer defendant, after generally denying the material allegations of plaintiff's petition, specifically alleged that load limit signs bearing the words "Load Limit 3 Ton" had been placed at either end of the bridge long prior to the accident, which warning was plainly visible and either had been seen or should have been seen by plaintiff before entering the bridge with a loaded truck weighing far in excess of the prescribed maximum limit, which act of plaintiff constituted negligence which was the sole proximate cause of the accident. Alternatively defendant averred that plaintiff's action was contributory negligence and a proximate cause of the accident. Interrogatories on facts and articles were attached to defendant's pleading and the gist of plaintiff's answers denied that he had seen a sign on the bridge but admitted his belief that his truck and its load exceeded three tons.
The issues developed on trial of the case, as we have above observed, were entirely factual in nature, which issues are pointed out in brief of defendant's counsel by way of assignment of error, and may be briefly stated as follows:
1. Was the plaintiff guilty of negligence constituting a proximate cause of the accident in driving a heavy truck and load upon the bridge when he should have realized from the appearance thereof that it was too weak to support such a burden?
2. Was the plaintiff guilty of negligence constituting a proximate cause of the accident in failing to observe and heed the warning of a load limit sign on the east end of the bridge from which he entered?
It is obvious that the answers to the questions postulated above must be found in a resolution of two facts, the weakened and unsafe condition of the bridge, apparent from observation, and the existence in place of a load limit warning sign at the east end of the bridge.
If either of the above facts was established by defendant it necessarily follows that plaintiff should not have been awarded judgment.
Proceeding to a discussion of these propositions in reverse order, we first observe that the record discloses an irreconcilable conflict of testimony as between the witnesses for plaintiff and defendant, respectively. On the second trial of the case counsel for the parties litigant agreed *125 upon the offering in evidence of the record developed on the occasion of the first trial, which record comprehended something more than 300 pages of testimony, in addition to various exhibits received in evidence. The record made up in the second case includes approximately 450 pages of testimony. By far the greater part of the 750 pages is devoted to the examination and cross-examination of the witnesses, who appeared in the two trials, with respect to the question of the existence, vel non, of the load limit sign on the east end of the bridge at the time of the accident. In the two trials a total of 14 witnesses appeared and testified on behalf of plaintiff, and 23 witnesses on the part of defendant. There was only one witness on each side who appeared in the first trial and did not reappear as witnesses on the second trial. Before undertaking the task of analyzing the testimony we feel constrained to make some observations which may serve as something of a background for such an analysis. Study of the record has particularly impressed us with the exceedingly high quality of ability of counsel for both parties in the art of cross-examination. In their demonstration of this highly developed science the learned gentlemen have succeeded, for all practical purposes, in neutralizing the testimony of witnesses for the opposition. By coincidence, both of the factual questions here involved are susceptible of establishment only through one of the most fallible and less developed of human qualities, the power of accurate observation. We do not think it out of place to note in this connection that the vast majority of individuals are lacking in certainty with respect to physical facts as to which they may have almost unlimited opportunities for observation. Strangely and paradoxically it would appear that the greater the familiarity the less the certainty. For example, we become accustomed to a chair being in a particular location in a room; a picture hanging on a wall, and though the chair or the picture might be moved, the chances are that we would be willing to state or perhaps willing to declare under oath that either of these objects remained in the position and the place to which we had long been accustomed. The converse of the proposition is equally true. All of which leads us to the conclusion that much of the testimony in the instant case must and should be considered as having comparatively little probative value. The fact that a number of the witnesses had occasion to frequent the immediate vicinity of the bridge and to cross the structure at frequent intervals, is not necessarily a circumstance which adds to the weight and value of their testimony one way or the other. Growing accustomed day by day, occasion after occasion to seeing a load limit sign affixed to a bridge, it is only natural that one might feel definitely assured that the sign was in place at a given time. By way of further illustration we present a quasi syllogism:
"I crossed the Point Pleasant Bridge twice each day during the first twenty days of September.
"On each occasion I noticed a load limit sign at the east end of the bridge.
"The sign must have been in place when I crossed the bridge at 7:00 o'clock A. M. on September 21st."
Obviously the conclusion is not justified by the premises established, yet this is a fair illustration of the usual development of a physical conclusion on the basis of oftrepeated experience. Because of this almost universal fallibility which obtains, except with respect to those individuals in whom the habit of accurate observation has been instilled either by need or training, a considerable number of the witnesses on the trial of this case, being subjected to intensive cross-examination, suffered a substantial deterioration or a complete breakdown of the weight and value of their testimony.
The question which was at issue on this point is limited. It did not concern the location of the sign prior to or after the restricted interval of time, centering upon the hour of 8:00 a. m. on September 21, 1948.
*126 Under this conception of the primary factual issue we have been able to eliminate from any serious consideration as to value and effect the testimony of many of the witnesses for both plaintiff and defendant, and we confine our discussion therefore to the testimony of those witnesses who had opportunity to make observation at times immediately before and after the occurrence of the accident. Nor do we think that the consideration of opportunity stands alone, for we think an additional and important element lies in the establishment of a motive for special and particular observation at the time mentioned. The measure of reliance to be placed in the testimony of the witnesses in this case should not be fixed upon the basis of the degree of certainty expressed by a witness unless that certainty is shown to have been founded upon circumstances which would have concerned the need for assurance and certainty at the time.
For the purpose of this evaluation, the witnesses within the limitation above suggested fall into three categories; first, those who were at the scene of the accident, that is, the bridge, before the occurrence thereof; second, those who were at the bridge at the time of the accident; and finally, those who were on the scene immediately following the occurrence.
In the first class, as witnesses for plaintiff, we find J. K. Skipworth, C. A. Prince and the plaintiff, James G. Norman. The witness, Skipworth, lived some six or seven miles from the Point Pleasant Bridge and, according to his testimony, he crossed the bridge from east to west on the morning of the accident, at which time there was no load limit sign at the east end of the bridge. We point out that Skipworth had been summoned as a witness for defendant but he was not tendered, and was called as a witness in rebuttal on behalf of plaintiff.
C. A. Prince, as we have above commented, was service engineer in the employ of Dowell, Inc., which was also plaintiff's employer, and was in charge of the operation of the truck convoy. He met the trucks at the Point Pleasant Bridge and talked to the drivers for some three or four minutes, after which he lead the way across the bridge. We quote the following pertinent testimony of the witness on direct examination:
"Q. As you approached the bridge, Mr. Prince, did you look to see whether there was any type of warning sign on the bridge? A. Yes, I stopped about a minute there and I looked and went on.
"Q. Tell this jury whether or not there was a warning sign on the bridge that morning? A. There was no warning sign on the bridge.
"Q. Was there a sign there that said `load limit three tons'? A. No.
"Q. You are absolutely certain of that, Mr. Prince? A. Yes, sir.
"Q. All right; and you proceeded on across the bridge? A. That's right.
"Q. Did any trucks follow you across the bridge? A. Yes, there was one truck followed me across the bridge.
"Q. What size truck was that? A. It was ayou mean the load limit or
"Q. No. how big was the truck? A. Oh, it was an International truck, a large truck, a tandem truck; an International tandem.
"Q. Did it have any type of equipment on the truck? A. It had a pump and a tank and it was pulling a four wheel trailer.
"Q. Now, how would the weight of that truck compare with the weight of the second truck? A. I would say that the two trucks would weigh pretty close to the same. I'm not sure of that, but I think they would."
After proceeding some distance up the road Prince stopped at a point where the convoy was to make a turn, and, after *127 waiting for about ten minutes, sent the driver of the Jeep, which had followed him, back to the bridge to find out if the other trucks were having trouble. The messenger returned in a very short time and informed Prince of the accident, and he immediately drove back through Bastrop and out to the east end of the bridge, arriving at this point approximately forty-five minutes after the accident. Again we quote from the testimony of the witness:
"Q. When you got back out there, Mr. Prince, with reference to the entrance to the bridge from the east side, where did you park your car? A. I parked my car right facing the bridge, close to the bridge right over to the right.
"Q. Right over to the right at the approach to the bridge? A. Yes, sir.
"Q. Mr. Prince, I am going to hand you a picture that is marked `D-3A' and ask you to look at it and take my pencil and mark on that picture approximately where you parked your vehicle. A. I don't believe I can write on this.
"Q. Just make any kind of a mark. (Witness complies) A. Well, I'd say it was right along here.
"Q. Would that be a distance of about two inches, on the picture, from the actual entrance to the bridge, where you parked? A. You mean a distancemy front wheels were practically along here; I remember the
"Q. Now, when you say `here' do you mean a point one inch from the entrance to the bridge as shown on the ruler? A. No, I'd say it was about three or four feet back this way.
"Q. In other words, you parked your vehicle about three or four feet from the entrance to the bridge on the east side. Now, at the time you got back there, Mr. Prince, about how much time had elapsed between the time you had crossed the bridge the first time going around, and when you came back? A. I'd say probably forty-five or fifty minutes.
"Q. Mr. Prince, at that time when you parked your vehicle there, was there a load-limit sign up? A. No, there wasn't.
"Q. You are absolutely certain of that? A. That's right.
"Q. You will take an oath on that? A. I sure will."
With reference to the testimony of the witness Prince, we think it appropriate to observe that we are impressed with the straightforward nature of his testimony and his very frank responses under severe cross-examination which left the effect of his testimony in chief unshaken. Further, this witness meets every qualification; he not only had the opportunity to make observation directed to the focal question of the existence of a load limit sign, but certainly he was under an obligation of duty to make such observation, for he was charged with supervising and directing the movement of the truck convoy and therefore was responsible in considerable degree for the safety of both the men and the equipment in his charge. When the witness testified that he stopped intentionally for perhaps as much as the space of a minute for the purpose of looking for any warning signs which might be visible, and further testifies positively and certainly, with full understanding that he is under oath, that no load limit sign was visible, the testimony may not be lightly disregarded.
The plaintiff, Norman, had never before crossed the Point Pleasant Bridge and was unfamiliar with that particular area. Plaintiff testified that after the convoy arrived at the bridge there was a wait of some thirty to forty minutes for the arrival of Mr. Prince, who was, in the words of plaintiff "* * * our boss, the man that was over us for that trip."
Norman testified that after Prince's arrival the convoy was set in motion and that *128 he observed the passage of the Prince automobile, the Jeep and the lead truck, the gross weight of which was equal to or in excess of his own truck, across the bridge; that as he approached the bridge he had to wait a minute or so for a school bus which proceeded across the bridge in the same direction, and that during this interval he had an opportunity to observe any sign which might have been on the bridge, but saw none. However, the plaintiff, in complete honesty, admitted that he made no special and intentional effort to look particularly for a warning sign of any nature but believed he would have seen one as it was his general custom and habit to note the existence of any such signs.
Plaintiff having been the only witness on either side who was present at the time of the accident, we proceed to the testimony of those witnesses for plaintiff who appeared on the scene immediately following the incident.
Dr. J. N. Jones, the coroner of Morehouse Parish, reached the scene of the accident shortly after its occurrence and immediately engaged himself in attempting to relieve the agony of plaintiff, who was screaming with pain, by administering a hypodermic of morphine. The doctor testified that the sign was not in place on the bridge until some three or four hours after the accident, but on cross-examination he modified the positive nature of his testimony to the extent of admitting that despite his own certainty he could not positively swear that the sign was missing from its place on the bridge at the time of his arrival.
The witness, Prince, as we have above related, returned to the bridge and reached the east end thereof some forty-five minutes after the accident, parking his car only a few feet from the right-hand side of the bridge. Portions of his testimony are above quoted in which appears his positive assertion that there was no sign even at this time on the bridge.
On rebuttal, the witness, Elmer Brewton, testified on behalf of plaintiff. According to the testimony of this witness he arrived at the bridge some time after the accident, that is about 10:30 or 11:00 o'clock, and found a number of people on the scene. We quote the following question and answer, by the witness on direct examination:
"Q. Now, Mr. Brewton, tell this court and jury if at that time and place, if there was anything said with respect to a load-limit sign? Now, don't say what was said but was there anything said? A. Well, there was some fellows standing there talking; I disremember who it was; asked where the sign was at on the bridge and a fellow picked it up laying in the grass at the end of the bannister on the bridge."
On cross-examination the witness was subjected to searching inquiry, particularly in the effort to elicit some nature of identification or description of the individual who had picked up the sign and placed it on the bridge. Counsel for defendant emphasizes the failure of the witness to give a single detail of description and points to his failure in this respect in support of the charge that the testimony was preposterous and unbelievable. We do not think such a conclusion necessarily follows and, quite to the contrary, such testimony might well be considered as attesting the complete honesty of the witness. We concede we could not support such a conclusion if the witness had been a woman, for in such event we feel safe in asserting that she would have been able to describe the clothing, and particularly the hat, which was worn by the person performing the act related. But the experience of every man, almost without exception, who fails even to observe a wife's new hat or dress would indicate that it is quite understandable that he would neither observe nor remember the appearance nor dress of a person whom he might encounter for only a brief moment of time. Credibility of the testimony of Brewton to some extent is supported by plaintiff's witnesses, Wolf and Skipworth, both of whom testified that on occasions prior to the accident they had observed *129 the load limit sign lying on the ground near the bridge.
Turning to defendant's witnesses, we find that Frank Mardis and his brother, R. B. Mardis, both testified that they had hauled loads of cotton pickers in their respective trucks across the bridge very early on the morning of the accident and that at these times they observed the sign on the bridge. However, we note that the testimony of these witnesses was not as clear-cut as might be desired and was to some extent evasive in character. The positive statements as to the presence of the sign were not obtained from either witness until a second or third round of redirect examination, their testimony up to such point having been to the general effect that they thought the sign was in place. The testimony of the witness, Bill Roberson, an illiterate Negro farmer of the immediate vicinity, is not entitled to consideration. Although the witness repeatedly testified with certainty that he had seen the sign earlier in the morning prior to the time of the accident, it developed that he was crossing the bridge from west to east and finally was forced to admit that he had not turned around and looked for the sign after leaving the east end of the bridge and could not swear that he actually saw the sign on that occasion. The witness, L. F. Robinson, a school bus driver, had crossed the bridge in his bus a short time prior to the accident, but this witness, while testifying that he had seen the sign in place on numerous occasions, admitted that he did not remember whether the sign was in place on that particular occasion. None of defendant's witnesses were at the scene of the accident at the time of its occurrence but defendant did present the testimony of five witnesses who were at the site of the accident after it had happened. The first of these was Sheriff Harp of Morehouse Parish, who, informed of the occurrence, reached the east end of the bridge some thirty or forty minutes following the accident. The Sheriff did not testify that the sign was in place when he reached the scene. After his arrival he engaged himself for some considerable time in taking necessary precautions with reference to fire hazards, and in other activities appropriate to his duties. Some time after the removal of plaintiff by ambulance to the hospital in Bastrop the Sheriff, as was his custom on such occasions, took some snapshot photographs of the scene. The resulting pictures and enlargements thereof plainly show the approach and eastern end of the bridge and the wreckage of the truck beneath the bridge. In several of these photographs there plainly and strikingly appears the much mooted warning sign bearing the words:
 Load
 Limit
 3 Ton
The time element in connection with the taking of these photographs is material, and counsel for plaintiff took great pains in his effort to attempt to fix the time factor with as much certainty as possible. After computing the several time lapses as testified by Sheriff Harp, we think the maximum, as contended by plaintiff's counsel, would indicate that the photographs were taken some three hours, more or less, after the accident. This, at best, can only be in the nature of an approximation, but, allowing a reasonable margin for error, we must conclude that the photographs were taken some two and one-half hours to three hours following the accident.
The exhibits in question constitute in themselves a most persuasive argument in support of defendant's contention as to the existence of the sign. They were exhibited to a number of the defendant's witnesses, who identified the sign as being the one observed and asserted to have been in place on the bridge. However, we think that the pictures showing the sign, at least in some instances, might have influenced the firmness of the witnesses in their conclusion that the sign must have been in place.
Defendant's witness, Yeldell, testified that he observed the sign on the bridge about an hour and a half after the accident. *130 The witness, G. R. King, was the highway foreman of this particular section of road, among his duties being the obligation to observe the proper placement and maintenance of road and bridge signs. The witness appeared on the scene shortly after the accident and testified that the sign was in place. However, under cross-examination, he admitted that he had no certain and positive remembrance to this effect. The witness, M. F. Hill, testified that he went out to the bridge about an hour after the accident; that he appears in one of the pictures taken by the Sheriff, and that the pictures were taken about twenty to thirty minutes after his arrival at the bridge. The time element as testified by this witness does not accord nor does it reasonably approach the time factor as hereinabove fixed in connection with the testimony of the Sheriff. The witness, Jim Cox, testified that he passed the truck convoy halted some fifty yards from the entrance of the bridge; that there were a number of men standing near one of the trucks; that the witness assumed they were discussing the advisability of attempting to cross the bridge with the heavy trucks, and, motivated by this consideration, he particularly noted the presence of the sign on the bridge. The witness, Sam Sparkman, testified that he was in his field very near the bridge, heard the accident, and ran to the scene immediately, noticing the presence of the sign as he passed by the end of the bridge, and went down the path to the location of the wrecked truck.
The above is a résumé of the testimony of those witnesses who were present immediately before, at the time of, and immediately after the accident. The conflict is real and in our opinion, as we have before commented, irreconcilable.
We think the answer to the first question, which tenders the factual issue of the condition of the bridge as bearing upon the alleged negligence of defendant and contributory negligence of plaintiff respectively, is simple of resolution. There is no question as to the responsibility of defendant for the maintenance of its highways and bridges in a safe condition for the accommodation of vehicular traffic. On trial plaintiff amply sustained the burden of establishing knowledge on the part of defendant as to the structural weakness of the Point Pleasant Bridge and the consequent danger attached to its continued use. It logically follows that the action of defendant in permitting the use of the structure in its greatly weakened condition constituted negligence in the absence of a showing of adequate precautions.
However, as we have noted, defendant counters the effect of its own negligence by charging contributory negligence constituting a proximate cause of the accident on the part of plaintiff in that he failed to observe the weakness of the bridge which he could and should have discovered. There is no need for any elaborate discussion of this proposition inasmuch as the testimony of the witnesses who appeared in this case conclusively fails to support defendant's contention on this point. It is quite true that the structure in question was in a woefully weakened and defective condition, but it is equally true that this condition was not noticeably reflected by such appearance of the bridge as might reasonably have been susceptible of observation to users of the highway. On the contrary, it is established that it was the underpinning of the bridge which gave visual evidence of its condition. We do not think it can be reasonably contended that drivers of vehicles on the highway should be expected to make a personal inspection of the underside of bridge structures in order to determine the safety of passage thereover. Nor do we think that there is any ground for attributing the necessity of engineering qualifications to drivers of vehicles, the possession of which might enable them to resolve the safety factor by means of careful observation dependent upon such professional qualifications and a background of training and experience. There is not the slightest showing in the instant case that there was danger connected with the passage of even a very heavy weight which could and should have been appreciable and *131 understandable to a vehicle driver possessed of the average qualities of observation and reason. The conclusion is inescapable that this defense must be rejected.
Our ultimate judgment in this case must be governed by the weight and effect, upon an appellate tribunal, which should be attached to the verdict of a jury and a judgment signed by the trial judge pursuant thereto. It has become axiomatic that the findings of a trial judge on questions of fact will not be set aside nor disturbed by an appellate court in the absence of manifest error. The same principle is applicable to a consideration of the verdict of a jury. Consistent adherence to this rule is evidenced by a long line of cases. The first report involving such a holding which we have been able to find is in the case of St. Romes v. Pore, 10 Mart., O.S., 203, decided in 1821. The opinion stated:
"* * * the conclusion of a jury or of a judge a quo would have considerable weight * * *, and could not be disregarded unless it appeared manifestly wrong * * *."
The opinion further observed:
"When a case is submitted to a jury on distinct issues of fact, unmixed with any legal questions, the law makes the finding of a jury conclusive in this court."
The authority of the holdings of appellate courts in this state over the intervening period of 132 years appears to consistently maintain this principle.
It is to be particularly noted that even the finding of error is not ground, per se, for the reversal of the judgment of a trial court or the setting aside of the verdict of a jury on appeal. The error, or errors, must be manifest, which is to say, "evident", "apparent", "clear", "visible", "unmistakable" and "indisputable".
As a practical proposition the reasons for this restriction are obvious. Unquestionably it is intended for the purpose of lending weight and persuasive influence to the effect of the actions of a trial court upon the consideration of an appellate tribunal. It emphasizes the distinction between a court of first instance which has the opportunity for considering diverse and important factors; for example, the appearance, attitude and conduct of the witnesses who testify on trial, which factors are proper elements for consideration in connection with the testimony, and an appellate tribunal which, perforce, must rely solely upon the cold type of the record as made up on appeal.
We are further impressed, in the consideration and interpretation of this principle, with the understanding that the human equation is definitely concerned. The conclusion of an appellate court, as justified by its opinion, is not intended to indicate that the members of such court would necessarily have determined the cause and found judgment as was rendered by the trial court had they been sitting on the case.
Certainly it is apparent that the credibility of the witnesses in this case was a matter of considerable and perhaps of vital importance. It has long been considered that the findings of a trial judge or the verdict of a jury, as to issues of fact dependent upon the credit and weight attached to the testimony of witnesses, will not be disturbed unless they are clearly wrong on the face of the evidence. In Breen v. Walters, 150 La. 578, 91 So. 50, 51, the opinion of the Supreme Court contains this declaration:
"The testimony is conflicting, but there is sufficient testimony, if accepted as true, to sustain the verdict of the jury, who are the exclusive judges of the credibility of the witnesses and of the weight and sufficiency of their testimony. The trial judge gave his sanction to their verdict, after hearing the witnesses in the case, which necessarily adds weight to the presumption of its correctness."
*132 And, again, in Selser v. Revol, 152 La. 447, 93 So. 675, 677, the court said:
"It is the peculiar province of a jury under the law of this state to pass upon the credibility of witnesses. A jury of the vicinage is presumed to know the witnesses and to be acquainted with their reputations for truth and veracity in the community in which they live. The jury see the witnesses, hear them testify, and are better capacitated to place a just estimate on their evidence than the judges of the Supreme Court on appeal, and their verdict, for these reasons, should not be lightly considered or hastily disturbed [cases cited].
"On questions of fact involving the credibility of witnesses, the verdict of the jury will not be disturbed unless manifestly erroneous [cases cited]."
In the last case above cited a motion for a new trial had been filed by defendants and overruled by the trial judge. In his reasons for overruling the motion the judge frankly stated that he did not believe the testimony which was submitted on behalf of plaintiff, despite which he refused the motion. In commenting on this action the Supreme Court said:
"The very purpose of a trial by jury is to decide the facts of a case, and we do not feel justified in setting aside the verdict of the jury in this case, where the testimony is conflicting, and the testimony of the plaintiff is sufficient to sustain such verdict, if accepted as credible. The jury has believed the plaintiff's testimony, and the trial judge has stated in his reasons for overruling the motion for a new trial that he does not believe that any new or additional testimony of any nature or kind could be introduced on a second trial, and that, if a new trial should be granted in this case, it would be simply a repetition of the trial already had; that is, it would result again in a verdict in favor of plaintiff."
We think the above observations are strikingly appropriate to the case before us. Our acceptance of the pronouncements and our acknowledgment of the effect of the authority noted indicates the necessity for affirming the judgment on appeal.
The only matter which remains for our determination is the quantum of damages.
Plaintiff alleged injuries resulting from the accident in the nature of compression fractures of the first and fourth lumbar vertebrae, a paralysis of the biceps muscle of the right arm, various multiple lacerations and bruises, and by supplemental petition a rupture of the fifth lumbar disk, with nerve root irritation. Plaintiff was hospitalized for a period of some ten days, remained in a body cast extending from the neck to a point below the hips for approximately six months and thereafter wore a Taylor spine brace for a period of a year more or less, after which time he has found it necessary to resort to its use at intervals. The testimony of the medical witnesses preponderates in favor of plaintiff's allegations as to the nature and extent of his injuries, although it is established that plaintiff has evidenced a remarkable recovery, particularly with respect to the effect of the muscular paralysis. In this connection we comment particularly on the fact that plaintiff appears to have shown a disposition to make every effort to respond to medical advice and direction, and, on trial of the case, he freely admitted the improvement in his general condition. However, we think there is no question as to plaintiff's permanent partially disabled physical condition. While, as developed on trial, he has been able to perform some light work, and probably will be able to do so in the future, we see no real indication of evidence that he will be able to perform heavy manual labor, and we conclude that such disability will be permanent. The effect in plaintiff's case will be, in all reason, a substantial decrease in his earning power for the remainder of his life.
*133 In returning a general verdict in favor of plaintiff the jury itemized the damages as follows:

"Suffering in past ......... $ 2,000.00
"Future suffering .......... 2,000.00
"Loss of past earnings ..... 8,000.00
"Insurance refund .......... 5,767.20
"Future medical expenses ... 2,500.00
"Loss of future earnings ... 20,000.00
"Previous medical expenses 1,500.00
 __________
 "Total $41,767.20"

In assigning reasons for overruling defendant's motion for a new trial, the trial judge appears to have taken cognizance of only one of the questions urged, which he discussed as follows:
"The defendant has filed a motion for a new trial, which is the issue now before the court.
"In its verdict, the jury itemized its findings and one of the items was the amount asked for by the compensation insurance carrier, The Indemnity Insurance Company of North America, but instead of awarding this amount out of the judgment rendered in favor of the plaintiff, the jury added this amount to the amount of damages, which is contrary to L.R.S. of 1950, 23:1103, and for this reason a new trial probably should be granted, but inasmuch as this case has been tried twice at considerable expense, and the Court of Appeals having authority to correct this error, it is the opinion of the Court that the motion for a new trial should be overruled."
By stipulation in this court plaintiff and intervenor have agreed that intervenor was entitled to a direct judgment against defendant in payment of its claim which is accepted by all parties as amounting to the total sum of $5,767.20. It was further stipulated that, without the necessity of remanding the case to the district court, the judgment appealed from should be amended by this court in such manner as to set forth a separate award in favor of intervenor, to be paid by precedence and priority over plaintiff and out of any judgment in his favor. Accordingly the provisions of the stipulation will be respected and given effect in the decree hereinafter set forth.
We do not think it desirable to burden this already lengthy and involved opinion with detailed discussion of the various items making up the quantum as awarded by the jury, and will therefore confine ourselves to a very brief analysis of each item and the reasons for alteration or amendment thereof.
Turning first to the awards totaling $4,000, equally divided in amount as between past and future suffering, we observe that the record does not, in our opinion, justify such an allowance. Unquestionably plaintiff, during the actually brief time in which he was pinned under the cab of his truck, which however must have seemed to him interminable, suffered an agony of pain and fear which can neither be described nor compensated. However, after being removed to the sanitarium and, certainly, following his first few days of hospitalization, we do not find evidence of any extreme or long continued pain and suffering of a severe degree. The effects of the injuries undoubtedly caused some suffering which will endure over a long period of time but to a consistently decreasing extent. On the whole we think a total allowance of $2,000 for past and future suffering would be adequate and consistent with the evidence on this point.
We do not find any reasonable ground for objection to the allowance of the lump sum of $8,000 covering loss of past earnings, but we are quite in accord with defendant's contention that the award of this amount and the separate allowance for the insurance refund are inconsistent. Proceeding to a consideration of the allowance which should be made in favor of intervenor, we find that the total of $5,767.20 consists of the following items and amounts:

*134
Paid to plaintiff as lump sum settlement
 of compensation claim $4,290.00
Paid out for medical expenses 782.00
Paid out for investigation and
 handling of plaintiff's claim 195.80
Attorney's fees 500.00
 _________
 $5,767.80

It is apparent that this compilation exceeds the amount allowed in favor of intervenor by sixty cents, which indicates error in the amount of the total award and which should be increased to this extent.
Reconciliation of intervenor's claim with the judgment indicates that there should be charged as against plaintiff's past earnings the sum paid by the insurer to the extent of $4,290, and further, that from the allowance of medical expenses as fixed by the jury in the sum of $1,500 there should be charged the sum of $782 for medical expenses actually paid by intervenor. Nor should plaintiff be taxed with the cost of investigating and handling his claim, although such an item is a proper charge against defendant on the part of intervenor. These conclusions necessitate a revision of the various items which are reflected in the itemization thereof as hereinbelow detailed.
We do not think plaintiff's evidence supported the allowance of $2,500 representing future medical expenses. The estimate for surgical service was indicated in the testimony of one of the medical experts as being approximately $1,000. We do not find that any showing has been made as to the cost of hospitalization and incidental services, but we believe an award of an additional sum of $1,000 would be adequate to cover such matters.
Consideration of the record does not impress us with the necessity for any revision, up or down, in the allowance of the amount of $20,000 in the nature of damages for loss of future earnings.
Under the allowance for previous medical expense in the sum of $1,500, consideration should be given to the expenditure of $782 by the intervenor and the amount should be reduced accordingly.
Pursuant to the above noted revisions, and in view of the stipulation between plaintiff and intervenor, to which no objection has been urged on the part of defendant, we will avoid in our decree the rendition of separate judgments. The amount of the award in the total sum of $34,195.80 is therefore predicated upon the following itemization:

Suffering, past and future $2,000.00
Loss of past earnings 3,710.00
Award to intervenor, Indemnity
 Insurance Company of North
 America:
 Paid plaintiff as compensation $4,290.00
 Paid out for medical
 services and attention 782.00
 Paid out for investigation
 and handling 195.80
 Attorney's fees 500.00
 _________
 5,767.80
Future medical expenses 2,000.00
Loss of future earnings 20,000.00
Previous medical expenses 718.00
 __________
 Total $34,195.80

For the reasons assigned the judgment appealed from is amended to read as follows:
It is ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, James G. Norman, and against the defendant, State of Louisiana, in the full sum of Thirty-four Thousand One Hundred Ninety-five and 80/100 ($34,195.80) Dollars, together with interest thereon at the rate of 5% per annum from date of judicial demand until paid, together with all costs.
It is further ordered, adjudged and decreed that the claim of the intervenor, In-Indemnity Insurance Company of North America, be and it is hereby recognized in the full sum of Five Thousand Seven Hundred *135 Sixty-seven and 80/100 ($5,767.80) Dollars, and defendant is ordered to pay the said amount to the named intervenor by preference and priority over defendant; to deduct the same from the total judgment hereinabove set forth, and to pay the difference to the plaintiff.
As amended, the judgment appealed from is affirmed at appellant's cost.
GLADNEY, J., dissents, giving written reasons.
GLADNEY, Judge (dissenting).
My disagreement with respect to several findings of fact and law as reported in the majority opinion requires this dissent.
First, I think the plea of contributory negligence is inescapable for the reason that beyond any reasonable doubt a warning sign bearing the words "Load Limit 3 Tons" was in place and staring plaintiff in the face when he attempted to cross the bridge with a loaded truck weighing twenty-nine (29) tons. The presence of the sign in place or not is the crux of the issue of contributory negligence specially plead by defendant. The opinion avoids a specific finding as to whether the sign was there, but inferentially holds it was not. Therein lies manifest error.
Proof is in the form of Kodak pictures taken by Sheriff Robert E. Harp of Morehouse Parish. His testimony was that close to eight o'clock on the date of the accident, in response to a `phone call, he went to the bridge which took about ten minutes, and within an hour after he got there he took the pictures. There can hardly be any doubt the pictures were taken before ten o'clock A.M. or about two hours at the most after the accident which occurred about eight o'clock. The following excerpt is taken from his testimony and represents the opinion of the witness as to the time when the pictures were taken:
"Q. About what time of day did you receive notice of the accident? A. Well, it was somewhere around eight o'clock.
"Q. In the morning? A. Or a little after, yes, sir. I usually get to the office a little before or after eight o'clock, and it was shortly after I got there.
"Q. Now, when you received that notice what did you do? A. I went immediately out to the scene.
"Q. Now, describe what you found out there when you got there, and what you did there. A. Well, first thing, of course, I went right on to the bridge and got out and went down under the hill where the bridge had broken through and the truck had fallen and the driver was pinned in the cab of the truck, and I did what I could to assist in making arrangements to get him out of the cab and one of my concerns was I didn't know what the truck was loaded with and I thought it might be inflammable and I was kinda looking out for a fire hazard; somebody might throw a cigarette down or a match or something.
"Q. So, Mr. Norman, the plaintiff in this case, was still in the truck, pinned down, when you got there? A. Yes, sir.
"Q. Did you do anything else around the scene of the accident after that? A. Well, yes, sir, I took some pictures.
"Q. How long after you got there did you take these pictures? A. I couldn't say definitely, but I didn't start taking the pictures, I don't believe, until after the man was gotten out of the cab. In other words, they were, I believe, getting him out of the cab, possibly when I took the first picture. To the best of my recollection that's when I took the pictures.
"Q. You took the pictures while they were getting him out of the cab? A. I believe they were bringing him out on the stretcher, yes, sir.
"Q. And about, just approximately, how long was that after you got there? *136 A. Well, it would be, I'd say, not less than thirty minutes, maybe longer than that.
"Q. As much as an hour? A. It could have been, yes.
"Q. Much more than an hour? A. I wouldn't think it was much more than an hour, no sir."
It is true the witness refused to swear as to the absolute accurate timing of each step undertaken on the occasion, but he did swear that the above was an expression of his opinion and recollection.
The evidence of Elmer Brewton who arrived at the scene of the accident at about 10:30 to 11:00 o'clock is quoted as indicating the load limit sign was not in place when he arrived. His testimony either shows that he arrived after the pictures were taken, in which event the existence of the sign in place would be of no particular import, or his testimony relating to the sign was false. The latter statement is unbelievable for the reason the evidence unqualifiedly shows numbers of people were constantly present prior to and after Brewton arrived. One would have to be naive, to say the least, to believe the sign could have been replaced in the presence of so many people in such a short time after the accident. It would appear, however, that this possibility was suggested. The Sheriff was asked as to what employees of the defendant were present and observed by him at the bridge. He testified he recognized only G. R. King. The latter was placed on the stand and completely refuted any implication he could have replaced the sign. He testified without contradiction:
"Q. When did you make that visit? A. Some time in the morning, I don't know just exactly.
"Q. Was that on the same day the accident occurred? A. Yes, sir.
"Q. When you got there, what was going on around there? A. Well, it was just a lot of excitement; folks walking around.
"Q. Did you see anybody around there that you knew? A. Well, Mr. Harp was there. He was the first man, Bob Harp.
"Q. That's the Sheriff of this Parish? A. Yes, sir.
"Q. What was he doing when you got there? A. Making pictures."
The only conclusion that can be reached is that King could not have replaced the sign. I submit the photographs manifestly show the sign was there when Norman attempted to cross the bridge. If we concede the presence of the sign when Norman attempted his crossing, there is no escape from the plea of contributory negligence.
Secondly, I cannot subscribe to the doctrine in the majority opinion which recites:
"On trial plaintiff amply sustained the burden of establishing knowledge on the part of defendant as to the structural weakness of the Point Pleasant Bridge and the consequent danger attached to its continued use. It logically follows that the action of defendant in permitting the use of the structure in its greatly weakened condition constituted negligence in the absence of a showing of adequate precautions."
Under this legal theory the Highway Commission would become the absolute insurer of all traffic, irrespective of the adequacy of warning signs indicating a hazard for unusual loads. The Supreme Court said in Department of Highways v. Fogleman, 1946, 210 La. 375, 27 So.2d 155, 157:
"It is incumbent upon every citizen using the highways and public bridges to do so with reasonable care. The general rule that a traveler about to cross a public bridge may assume that it is strong enough for his purpose does not apply when he proposes to cross with an `unusual load'. Nelson v. City of Rockford, 186 Ill.App. 288; Board of Com'rs of Allen County v. Creviston, 133 Ind. 39, 32 N.E. 735. See, also, 68 A.L.R. 605 et seq. It *137 would be a desirable situation if all of the highway bridges could hold up the maximum loads permitted but, in Louisiana, we are faced with the fact that many of our bridges were built before the transportation of such loads were usual or even contemplated. Many of these bridges still serve their original purpose in their respective communities, particularly in the transportation of passenger and other light vehicles. One who proposes to transport an unusual or undue load over a public bridge, particularly on a secondary route, is under the duty to exercise care and caution. In the absence of such care, a person driving such vehicle assumes the risk of injury to himself and cargo in trying to pass over the bridge. Wilson v. Grandy [Granby], 47 Conn. 59, 36 Am.Rep. 51; Clapp v. Ellington, 51 Hun 58, 3 N.Y.S. 516; Carter v. Town of Minden, 156 La. 382, 100 So. 336."
Also, it is my opinion the majority view places undue emphasis upon the obligation of this court to follow jury verdicts. Our consideration of a jury verdict is subject to no more limitation than our consideration of the judgment of a trial court upon a question of fact. In commenting upon the obligation of the court of appeal to determine the correctness of the judgment of a district court on a question of fact, it was said in Crawford v. Bullock, 1946, 209 La. 552, 25 So.2d 226, 227:
"Plaintiff complains of the reversal by the Court of Appeal of the judgment of the District Court on a question of fact. There is no merit in the complaint. The Court of Appeal is made the judge of facts, as well as of law. Const.1921, Art. 7, § 29. Where testimony is conflicting the Court of Appeal, in the exercise of its appellate jurisdiction, is bound to weigh it, as well as the court of original jurisdiction. And where the Court of Appeal differs with the court below as to the weight of the testimony, it is not only empowered, but it is its duty to reverse the judgment."
I also find myself unable to agree with the quantum of damages awarded in this case as being excessive and out of line with other decisions of this court. The judgment, as amended, awards plaintiff the sum of Thirty-Four Thousand One Hundred Ninety-Five and 80/100 ($34,195.80) Dollars. Plaintiff testified at the time of trial that he was working with the Texas-Eastern, a gas transportation company, with whom he has a job, presumably regular or permanent, as a night watchman and receives a salary of $230 per month, plus overtime. His present complaints manifestly show that he is not totally disabled under any definition except as employed in workmen's compensation cases.
For the foregoing reasons, I respectfully dissent.