80 So.2d 858

James G. NORMAN

v.

STATE of Louisiana.

No. 41677.

March 21, 1955.

Rehearing Denied May 23, 1955.

Joseph A. Loret, D. Ross Banister, Philip K. Jones, Baton Rouge, Francis X. Vinet, New Orleans, H. S. Hawthorne, Bastrop, Louis S. Quinn, W. Crosby Pegues, Jr., Baton Rouge, General Counsel La. Dept. of Highways, for defendant, appellant, applicant.

Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, for intervenor.

Browne, Browne & Bodenheimer, Shreveport, G. M. Bodenheimer, Jr., Shreveport, of counsel, for respondent.

McCALEB, Justice.

Plaintiff, James G. Norman, suffered painful and serious personal injuries on the

morning of September 21, 1948, when a wooden bridge spanning Bayou Bartholomew in Morehouse Parish collapsed under the heavily loaded truck he was driving. Plaintiff was employed as a truck driver for Dowell, Inc., which is engaged in the business of acidizing oil and gas wells, and, at the time of the accident, he was driving the middle truck in a convoy of three which had been sent from Sheveport with hydrochloric acid for the purpose of servicing certain gas wells of the Southern Carbon Company located in Morehouse Parish. These trucks had proceeded in a westerly direction over paved Highway No. 165 and, after reaching Bastrop, turned into Highway No. C–1488, a secondary graveled State road. According to previous instructions, the trucks halted at the eastern terminus of the wooden bridge spanning Bayou Bartholomew to await the arrival of Mr. C. A. Prince, the service engineer of Dowell, Inc., who was to direct the convoy to the site of the oil well operations. Mr. Prince arrived in his automobile at about 8:00 a. m. and led the way across the bridge. He was followed by the lead truck, which passed over the bridge safely, despite the fact that it carried approximately the same tonnage as the truck driven by plaintiff. The latter, after waiting for a school bus traveling in the same direction to go over, then proceeded to cross the bridge. But, when he had traversed two-thirds of it, the structure gave way, the truck was precipitated into a ravine 20 feet below, and plaintiff was severely injured in the fall. After the accident, plaintiff was paid workmen's compensation in the sum of $5,767.80 by Indemnity Insurance Company of North America, the insurer of his employer, and was authorized by Act No. 102 of 1952 to sue the State. This action for $84,500 damages followed and the insurance carrier intervened under R.S. 23:1103, praying for reimbursement of the compensation paid by it.

Plaintiff's cause of action is founded on the charge that the substructure of the bridge was rotten and that the Department of Highways of the State was negligent in not keeping it in a safe condition.

The State denies the allegations of negligence, asserting that the bridge was maintained in an adequately safe condition for use of the light traffic which it was designed to serve, that is, vehicles not exceeding three tons in weight, and that signs were posted on each end bearing the words "Load Limit 3 Ton". It avers that, despite this warning and the otherwise apparent frailty of the structure, plaintiff imprudently attempted to pass over it with a load of 29 tons and that his rash action in this respect was the proximate cause of the accident. Further, in the alternative, it pleads contributory negligence as a bar to recovery.

In conformity with plaintiff's prayer for trial by jury, the case was twice tried in the District Court. On the first occasion, a mistrial was entered on the failure of the jury to agree. But after another trial, the

jury returned a verdict (by vote of 9 to 3) in plaintiff's favor for $41,767.30 damages. On appeal, the Court of Appeal, Second Circuit, approved the judgment by a two-to-one vote.[1] However, it made a technical amendment thereto, decreeing that plaintiff should recover $34,195.80 and the intervening insurance company $5,767.80. See 69 So.2d 120. Upon defendant's application, we granted a writ of review and the matter has been argued and submitted for our decision.

Although the record in this case consists of approximately 900 pages, the primary issue for determination, as shown by the foregoing statement, is relatively simple, i. e., whether the Department of Highways was negligent in maintaining the bridge in the condition shown by the evidence. If so, then the question of plaintiff's alleged contributory negligence becomes material in deciding whether his act in attempting to cross the bridge with the heavy truck, under the circumstances presented to him, was so imprudent as to bar his recovery.

Soon after the accident (not over 1½ hours later), the Sheriff of Morehouse Parish, who had been called to the scene, took a total of 7 photographs, which we find to be of substantial importance in the case. Four of these photographs are pictures of the wooden bridge showing its eastern terminus and exhibiting the metal sign "Load Limit 3 Ton" affixed to the railing on the right side of the approach. The other three pictures display the collapsed portion of the bridge and the fallen truck in the ravine. Several of the photographs have been enlarged, and those taken from the eastern approach of the bridge demonstrate that it is a secondary highway bridge such as one would normally expect to find connected with a gravel road in a sparsely settled area. This being so, it seems manifest that an experienced truck driver should have instantly realized that it would be exceedingly hazardous to drive a 29-ton load over it. However, plaintiff asserts that he should not be adjudged to have been imprudent, because the three-ton-limit sign was not affixed to the bridge when he attempted to traverse it and further, that the successful crossing of the lead truck in the convoy, which carried a similar load, lulled him into a sense of security that it was safe for him to follow.

But, even if we assume that the foregoing factors might have afforded plaintiff some basis for believing that this country bridge could withstand the great weight of his load, it does not aid him in his demand for damages unless the proof is sufficient to exhibit that the State was at fault.

Reverting, then, to the obligation of the Department of Highways to the traveling public, it may be stated in general that public bridges and roads must be maintained in a reasonably safe condition and that a traveler has the right to assume that a

1. Gladney, J., dissented.

bridge is strong enough to support the weight of his vehicle. But this rule has its exceptions. It is applicable, of course, on major State highways as to all vehicles of weights within the permissible limit of tonnage allowed by State law. But it is clearly not appropriate to the use of heavy equipment over a secondary road and bridge such as the one in question. This court tersely stated the doctrine governing the instant matter in Department of Highways v. Fogleman, 210 La. 375, 27 So.2d 155, 157, thus:

"It would be a desirable situation if all of the highway bridges could hold up the maximum loads permitted but, in Louisiana, we are faced with the fact that many of our bridges were built before the transportation of such loads were usual or even contemplated. Many of these bridges still serve their original purpose in their respective communities, particularly in the transportation of passenger and other light vehicles.

\* \* \* \* \* \*

"The Highway Department was not bound to provide at every crossing point a bridge capable of sustaining the heavily loaded truck and trailer vehicles that normally move over the much traveled or 'through' highways. The bridge was not one over a through highway and the placing of normal load limit signs at both ends of the bridge would, under ordinary conditions, satisfy the common rules of safety."

Such being the law, let us examine the evidence in the case. It is shown that the underpinning of the bridge was not in good condition; it had been formerly suitable for loads up to 8 tons but, upon discovery of its weakened substructure, the Department of Highways found it to be only strong enough to accommodate loads not exceeding three tons. It was therefore not negligent for the Department to permit the bridge to be used for light traffic provided precaution was taken, as it was in this case, to warn the public of its load capacity. Accordingly, it is certain that plaintiff's action necessarily fails if the three-ton-load-limit sign was affixed to the eastern approach of the bridge, as shown by the photographs taken shortly after the accident.[2]

But plaintiff maintains that this sign was not in its usual place just prior to the accident and he produced 13 witnesses including himself and his foreman, Prince, who testified accordingly. Defendant, on the other hand, put 33 witnesses on the stand who stated that the sign was there at all times. It can thus be seen that the question of the

---

2. Moreover, it would not automatically follow that the State would be liable even if a third person, without its knowledge or consent, removed the sign from the bridge. In such event, responsibility would depend upon whether the Department of Highways had actual or constructive notice that the sign was missing and failed, within a reasonable length of time, to remedy the situation.

presence or absence of the sign became the vital issue in the case.

An examination of the judgment of the Court of Appeal reveals that the prevailing opinion does not take an affirmative stand on this question but concludes that, since the plaintiff had satisfied a majority of the jury that the sign was not there, its verdict should not be disturbed.

 For our part, a reading of the conflicting evidence leaves us with the strong conviction that plaintiff has fallen far short of establishing that the load-limit sign was not in its usual place when plaintiff attempted to traverse the bridge. We have not based this conclusion solely on the fact that the State had 33 witnesses testifying for it, whereas plaintiff had 13—for the weight of evidence does not depend on the number of witnesses alone but, rather, on its quality, taking into consideration the witnesses' interest in the outcome of the litigation, their familiarity with the matter of which they speak and all of the other surrounding circumstances of the case. On all counts, we find the testimony of the State's witnesses to be superior to that given by plaintiff's witnesses, for most of them were farmers and small tradespeople who lived within the near vicinity of this bridge and had occasion to use it constantly. In addition, the positive evidence of these witnesses coincides with the reasonable probabilities which find corroboration in

uncontroverted demonstrative proof, i. e., the photographs taken within 1½ hours, and certainly not more than 2 hours following the accident, showing that the sign was in its usual place, affixed to the railing of the bridge.

On the other hand, acceptance of plaintiff's evidence would require us to find that, during the interval of time between the occurrence of the accident and the taking of the pictures, some unknown person or persons retrieved the missing sign from wherever it lay and attached it to the railing of the bridge. Actually, one of plaintiff's witnesses goes so far as to testify that this is exactly what happened. He stated that one of two strange men, who were together, picked up the sign shortly after the accident and placed it on the railing of the bridge. But the veracity of this witness was seriously brought in question by a searching cross-examination during which he stated that he could not remember a single detail of the appearance or costume of either of these strangers, not even if they were clean shaven or had beards.

The State has filed in this court a plea of prescription to plaintiff's action. In view of the conclusion we have reached, it is unnecessary to consider the plea.

For the foregoing reasons, the judgments of the trial court and the Court of Appeal are reversed and set aside and it is ordered that plaintiff's suit and the intervention of

the Indemnity Insurance Company of North America be dismissed at their costs.

HAWTHORNE, J., recused.

HAMITER, Justice (dissenting).

Since I am unable to conclude that there is manifest error in the verdict of the jury and judgment of the trial court, as affirmed by the Court of Appeal, I must and do respectfully dissent.

MOISE, Justice (dissenting).

I am not critical of decisions, because I realize that all judges are fallible and that these judges have a right to think—the right even to think wrong, if at the time they think they are right.

But, what forcibly impresses itself on my mind is—did the jury, the trial judge by necessary implication, and the Court of Appeal, think wrong when they held for this plaintiff? When we reverse a judgment on the facts it must be affirmatively shown that the judgment was manifestly erroneous, and in my opinion this decision does not do that.

We may be inadvertently magnifying the magnificance of the executive plutocrat and affirming the poverty and right of the so-called American sovereign, the plaintiff in this case.

I respectfully dissent.